UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANNE EHLERT,
     Plaintiff,


v.                                   CIVIL ACTION NO. 18-10357-MPK[1]


METROPOLITAN LIFE
INSURANCE COMPANY,
     Defendant.


MEMORANDUM AND ORDER
ON MOTION FOR JUDGMENT
ON THE JUDICIAL RECORD (#54) AND
DEFENDANT'S MOTION FOR JUDGMENT
ON THE ADMINISTRATIVE RECORD (#56).


KELLEY, U.S.M.J.

I. Introduction.

Plaintiff Anne Ehlert is a participant in the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 *et seq.*, welfare benefit plan issued to Towers Watson, plaintiff's former employer, by defendant Metropolitan Life Insurance Company (MetLife), which administers the Towers Watson Health and Welfare Benefits Plan (LTD Plan). (#14 ¶ 1.) Ehlert claims that MetLife unreasonably and unlawfully denied her long-term disability (LTD) benefits

---

[1] With the parties' consent, this case has been assigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 363(c). (#26.)

due to her under the LTD Plan, in violation of 29 U.S.C. § 1132. *Id*. ¶¶ 58-67. In addition to an award of disability benefits, plaintiff seeks to recover "a reasonable attorney's fee and costs of the action" under 29 U.S.C. § 1132(g). *Id*. ¶¶ 68-73. The parties have filed cross-motions for judgment on the Administrative Record (##54, 56), [2] which have been fully briefed. (##55, 57, 62-66.) The competing motions stand ready for decision.

## II. Procedural history.

Ehlert began working at Towers Watson on September 8, 2003, and her last day of work was December 23, 2015. (AR at 97, 119, 448, 2357.) She applied for benefits under the LTD Plan in August 2016, stating that she was unable to perform the duties of her job due to "fatigue, short term memory and cognitive/organizational issues, [and] headaches." (AR at 97, 118-38.) Her LTD claim was denied on November 21, 2016. (AR at 2224-28.) On May 9, 2017, Ehlert appealed the denial of the claim. (AR at 2001-2162.) The denial was upheld on November 9, 2017.  (AR at 507-19.)  This case was filed on February 24, 2018. (#1.)

## III. The Facts.

Ehlert was employed as a consulting pension actuary for pension plans of large and medium size companies. (AR at 1071, 2030.) According to plaintiff, "[t]he work was intellectually demanding and physically demanding when there were many or large projects going on at once . . . and required strong organizational skills and the ability to juggle multiple demands." (AR at 2311.) Her job was sedentary; Ehlert reported that she spent 7¾ hours per day sitting, and fifteen minutes per day walking. (AR at 1072; 1380-81.) In about 2000 or 2001, she developed chemical sensitivities which impacted her ability to work in large office buildings, so she worked from home for all or part of most days. (AR at 2034.)

---

[2] The Administrative Record (#38, volumes 1-5) will be cited as AR at (page number).

A.  The LTD Plan.

The LTD Plan provides benefits to participants who are disabled within the terms of the

plan. (AR at 7.) By definition:

> Disabled means that due to sickness, or as a direct result of accidental injury, you
> are receiving appropriate care and treatment and that you are complying with the
> requirements of such treatment and that you are:
>
> - Unable to earn more than 80% of your predisability earnings at your own
>   occupation for any employer in your local economy after a 26[-]week
>   elimination period and during the 24 months of sickness or accidental
>   injury, and
> - After such period, that you are unable to earn more than 60% of your
>   predisability earnings from any employer in your local economy at any
>   gainful occupation for which you are reasonably qualified taking into
>   account your training, prior education[,] and experience.

(AR at 12.) Under the terms of the LTD Plan, the burden is on the claimant to provide proof[3] to

the Claims Administrator that she has a disability. (AR at 65, 71, 77, 81.) While receiving LTD

benefits, a claimant is entitled to continuing coverage for health and life insurance as well as

pension benefits. (AR at 27.)

MetLife is the Claims Administrator of the LTD Plan. (AR at 91-93.) The LTD Plan

provides:

> In carrying out their respective responsibilities under the Plan, the Plan
> administrator and other Plan fiduciaries shall have discretionary authority to
> interpret the terms of the Plan and to determine eligibility for and entitlement to
> Plan benefits in accordance with the terms of the Plan. Any interpretation or
> determination made pursuant to such discretionary authority shall be given full

---

[3] Proof is defined as:
> Written evidence satisfactory to [the Administrator] that a person has satisfied the
> conditions and requirements for any benefit described in this certificate. When a
> claim is made for any benefit described in this certificate, Proof must establish:
> - the nature and extent of the loss or condition;
> - [the Plan's] obligation to pay the claim; and
> - the claimant's right to receive payment.

AR at 65.

force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

AR at 93.

B. Medical History.[4]

Ehlert's medical records show that she reported developing a chemical sensitivity around 2000, and that she has a history of attention deficit disorder. (AR at 356, 420, 606, 2034.)[5] In June 2012, laboratory testing showed negative anti-Lyme antibodies, and in August 2012 Elhert denied any recent contact with ticks. (AR at 610, 2522.)[6] In November 2012 Elhert told Dr. Long at Massachusetts General Hospital[7] that she had a number of chemical sensitivities that made her "tired and experience[] unclear thinking." (AR at 2508.) Notes from her annual physical in February 2014 again indicate that cleaning chemicals and fragrances made her disoriented and tired. (AR at 2483.)

After an automobile accident, Elhert saw her doctor, Lela Caros, M.D., on July 28, 2014, with a complaint of joint pain in her hands. (AR at 2477.) The doctor found no swelling, and her hands were not warm nor did they look red. *Id*. Ehlert mentioned that her neighbors had Lyme disease and she thought that might be the cause of her joint pain, but she had not seen any ticks on her body. *Id*. Plaintiff was tested for Lyme disease; the results were negative, but the microbiology

---

[4] The administrative record is 3,000 pages in length, consisting primarily of medical records. Like the parties, the court will highlight key aspects of the medical history.

[5] One of MetLife's independent physician consultants noted that plaintiff's claims of multiple chemical sensitivities are unsubstantiated. (AR at 636.)

[6] In the summer of 2012, Ehlert was being evaluated for a right groin mass. (AR at 610, 2522.)

[7] Aiden Long, M.D., at Allergy Associates Massachusetts General Hospital, saw Ehlert on a consultation referral from plaintiff's primary care physician, Dr. Lela Caros, for evaluation of an unspecified dermatitis. (AR at 2508.)

report indicated the possibility of low or undetectable antibody levels. (AR at 388, 612.) Elhert started a two-week course of antibiotics. (AR at 612.)

In October 2014 plaintiff began seeing Dr. Jeanne Hubbuch; her care with Dr. Hubbuch continued through mid-July 2016. (AR at 366, 838.) Dr. Hubbuch's notes from her initial visit reflect that Ehlert stated that she may have had a tick bite in 2013. (AR at 367.) Ehlert had been rear-ended in a car accident in July 2014 which caused neck stiffness and back pain. *Id*. At about the same time plaintiff reported her joints and knuckles were tender, she was very tired, she had some short-term memory issues, and her balance felt off. *Id*. According to Ehlert, her memory, joint pain, and fatigue were better following a course of doxycycline at the end of August. (AR at 368.) She slept 6-8 hours nightly and felt okay exercising for 30 minutes, either biking or walking. *Id*.

On February 12, 2015, Ehlert's "Western blot" test was interpreted as consistent with Borrelia burgdorferi infection at some time in the past. (AR at 428.) Dr. Caros, who had ordered the test, explained that the Lyme testing showed evidence of past Lyme infection, but no current or active disease (IGM testing was negative). (AR at 431.)

Plaintiff had an appointment with Dr. Hubbuch in April 2015. (AR at 339-41.) Among other things, Ehlert complained about getting only 5-6 hours of sleep nightly due to worries and ruminating, being depressed and overwhelmed, and having a memory problem. (AR at 340.) Ehlert stated that her job was in jeopardy and she was not doing well. *Id*. Plaintiff reported she exercised by walking the dog and going to the gym two or three times a week. *Id*.

In June 2015, Dr. Hubbuch had Elhert tested for Babesiosis, which came back negative; she was not tested for a Bartonella infection. (AR at 342, 613, 1220-21.) Plaintiff still had the same reported memory and cognitive problems, especially short-term memory. (AR at 342.) She

reported doing a 3-hour hike, which was difficult for her, going to the gym for 15-20 minutes two or three times a week, and walking her dog for thirty minutes. *Id*. Dr. Hubbuch noted Ehlert's Lyme and Bartonella symptoms to be better. (AR at 343.)

At an appointment on September 30, 2015, Dr. Hubbuch noted plaintiff's chief complaints were memory and fatigue. (AR at 345.) Ehlert described having trouble accomplishing tasks at work as well as difficulty with her memory and organization, and related that her work was stressful. *Id*.

On October 20, 2015, Ehlert had an appointment with Dr. Cary York-Best for a routine gynecological examination. (AR at 1120-22.) Dr. York-Best's notes reflect that plaintiff reported that over the prior two years she had had memory difficulties, joint pain, numbness, and tingling, and had been diagnosed by an alternative provider as having Lyme disease; she had been treated with antibiotics, which she stopped taking. (AR at 1120.)

Notes from a visit with Dr. Hubbuch on November 2, 2015, state that plaintiff was being laid off from work. (AR at 347.) Dr. Hubbuch's plan was for Ehlert to have a PET scan of her brain, neuropsychological testing, and undergo a sleep study. (AR at 348.) None of the recommended testing had been done by plaintiff's next appointment with Dr. Hubbuch on December 16, 2015. (AR at 350.) At that visit, Dr. Hubbuch indicated that Ehlert was unable to continue full-time work due to fatigue and cognitive issues. *Id*.

On December 21, 2015, Dr. Hubbuch completed a Certification of Health Care Provider with respect to Ehlert in which she stated that plaintiff had had chemical sensitivity since 2000. (AR at 356.) Dr. Hubbuch asserted that plaintiff was diagnosed with Lyme disease since June 2014 with resultant joint pain, stiffness, fatigue which was worse with exercise or exertion, tinnitus, trouble problem solving, memory issues, and anxiety, and that all of her symptoms had worsened

6

over the last 3-4 months. (AR at 357.) Ehlert was also said to have dizziness, sleep disturbance, and headaches which had been constant in the last month. *Id.* Dr. Hubbach stated that plaintiff would be incapacitated from December 24, 2015 to March 24, 2015, and that after March 15th, she would be able to work eight hours per day, three days per week. *Id.*

Ehlert's last day working for Towers Watson was December 23, 2015. On January 4, 2016, Dr. Hubbuch completed a report for MetLife regarding her opinion that Ehlert was unable to work. (AR at 334-50.) She stated that Ehlert had difficulty with focus and her concentration was worse with fatigue and joint pain. (AR at 335.) Dr. Hubbuch indicated that plaintiff could sit for sixty minutes at a time, for a total of 6-8 hours per day; stand for 10-15 minutes for a total of 30-60 minutes per day; walk for 15-20 minutes for a total of thirty minutes per day. *Id.* Ehlert's symptoms were listed as trouble with focus, fatigue, joint pain, stiffness, memory loss, and anxiety. (AR at 336.) Dr. Hubbuch reported that plaintiff was off antibiotics and herbs, that she needed further testing (the same tests that were recommended at her November 2, 2015 appointment), rest, and to start a slow exercise program. (AR at 337.) Ehlert's estimated return to work date was March 24, 2016. *Id.*

Ehlert was first seen by David M. Crandall, M.D., Co-Director of the Dean Center for Tick Borne Illness Treatment, Rehabilitation and Recovery at the Spaulding Rehabilitation Hospital (Spaulding) in Boston, on February 11, 2016, "for associated neurocognitive issues associated with persistent Lyme disease." (AR at 560, 2113.)

Beginning in March 2016, Ehlert attended eighteen sessions of speech and language therapy at Spaulding focusing on improving attention, memory, speed of processing, communication strategies, and cognitive compensatory strategies. (AR at 2076-2127.) Her initial assessment when starting these sessions was that she "present[ed] with mild cognitive-

7

communication characterized by decreased attention, memory[,] and executive function skills as well as a question of mild word finding deficits." (AR at 1059.)

In an April 2016 visit, Dr. Crandell noted that her neuropsych testing showed her to be in the superior range on the WAIS-IV with high scores on perceptual reasoning and working memory. (AR at 2113.) Mild sequencing issues were observed. *Id*. Her sleep study revealed sleep apnea and, although she was not fitted for a CPAP system, she used her husband's CPAP from time to time. *Id*. Testing was consistent with prior exposure to Bartonella, while PCR testing for blood serum and cultures were all negative. *Id*. Her number one complaint was trouble with memory, followed by being sad with decreased pleasure, and then fatigue. *Id*.

From May 31, 2016, through August 30, 2016, Ehlert was treated with acupuncture by Bridget Chin, M.D., at Spaulding. (AR at 2077-78, 2081-82, 2090-91, 2094-95, 2099-2100, 2102-03.)

At an appointment with Dr. Crandell on June 30, 2016, plaintiff "continue[d] to express some mild anxiety and concerns about her cognitive impairment[.]" (AR at 2092.)

Ehlert participated in occupational therapy at Spaulding from July through November 2016 on a referral for the treatment of convergence insufficiency by Kevin Houston, O.D. (AR at 2062-66, 2070-75, 2079-80, 2083-85, 2107-08.) [8]

---

[8] "Convergence insufficiency (CI) is a condition in which a person's eyes have a tendency to drift outward when looking at objects at near distances, and their ability to converge (rotate the eyes towards each other) is inadequate. People with CI may have symptoms when trying to perform near-based activities such as reading, working on a computer or smart phone, watching video, or playing video games. Symptoms include performance-related problems (loss of concentration, loss of place with reading, reading slowly) and eye-related symptoms (eyes hurt, diplopia, blurred vision, headaches)." https://www.nei.nih.gov/learn-about-eye-health/eye-conditions-and-diseases/convergence-insufficiency (last visited 11/13/2020).

Ehlert was a patient of Katherine Lantsman, M.D., Board Certified in Internal Medicine and founder of My Path Medical Wellness Center, from September 2016 through April 2017. (AR at 556-67, 2039-59.) At a December 2016 appointment, Dr. Lantsman noted that plaintiff's fatigue was better, but her cognition and memory had not improved. (AR at 2042.) The following month Dr. Lantsman prescribed "antibiotics that will have better brain penetration" to address Ehlert's memory impairments and deficits in organizational skills and a brain MRI was ordered to investigate her memory issues and headaches. (AR at 1991.) [9]

On April 6, 2017, plaintiff underwent neurological testing with Peter Novak, M.D., Ph.D., at Brigham and Women's Hospital. (AR at 1878-95.) The chief complaint was noted to be congenital control alveolar hypoventilation syndrome. (AR at 1878.) The autonomic testing resulted in an abnormal study, the results of which were consistent with: "[s]mall fiber neuropathy, mixed, length-dependent, affecting sensory and autonomic fibers"; "[a]utonomic dysfunction, mild, affecting all major branches of autonomic nervous system"; "[o]rthostatic cerebral blood flow velocity was reduced and was associated with hyperventilation without orthostatic hypotension"; and "[h]yperventilation during the supine position and the tilt." (AR at 1885.) After noting a number of autonomic symptoms and modifying factors, with respect to functional impairment, Dr. Novak stated "[p]atient is (sic) no disability." (AR at 1886.) The "[n]eurological examination showed distal sensory loss and depressed reflexes." (AR at 1891.) Dr. Novak's impression was "[l]arge and small fiber neuropathy due to Lyme disease?"; "[c]ognitive deficit"; and "OSA on CPAP." (AR at 1892.)

---

[9] Although not in the record, Dr. Lantsman reported that the brain imaging was done on March 16, 2017, and showed "no brain parenchymal or leptomeningeal involvement, the latter of which could not be ruled out since contrast was not used." (AR at 629.)

In a follow-up evaluation in April 2017, Dr. Crandell noted that the results of Elhert's recent neurological workup found some symptoms consistent with small fiber neuropathy, but no significant large fiber neuropathy. (AR at 1858.) Ehlert was continuing to complain about numbness in her hands and brain fog symptoms with some fluctuation; she rated her pain and fatigue level in the prior two weeks as 8/10; she described trouble falling asleep and feeling restored, but she had increased exercise with walking, swimming and biking. (AR at 1858-59.)

On September 1, 2017, Dr. Crandell completed a Residual Functional Capacity Questionnaire regarding Ehlert in which he identified her symptoms as numbness, fatigue, lack of endurance, headaches, and difficulty remembering, but also noted that she was not totally disabled from any occupation. (AR at 749-50.)

On October 23, 2017, Dr. Lantsman completed a Residual Functional Capacity Questionnaire on Ehlert, identifying her symptoms as follows: balance problems, poor coordination, weakness, unstable walking, falling spells, numbness, tingling or other sensory disturbance, hand pain, fatigue, bladder problems, nausea, lack of endurance, vertigo/dizziness, headaches, difficulty remembering, confusion, light sensitivity, sound sensitivity, difficulty solving problems, speech/communication difficulties. (AR at 525-28.) Dr. Lantsman stated that Ehlert could not "sustain attention for more than 15-60 minutes, [she] has chronic fatigue and low endurance [and] cannot stand for long periods due to dysautonomia, [and] also muscle weakness, joint pain, headaches[.]" (AR at 525.)

C. The Decisions.

In August 2016 plaintiff applied for LTD benefits. (AR at 97, 118-38.) MetLife reviewed the medical evidence submitted by plaintiff, as well as reports of its medical consultants. Peter Lourgos, M.D., J.D., MetLife Senior Psychiatric Medical Director, conducted a psychiatry file

review on May 11, 2016. (AR at 256-58.) He opined that "the available medical information does not support continuous psychiatric cognitive functional impairment that would impact [Ehlert's] ability to perform full time work during the period of review." (AR at 257.) Dr. Lourgos specifically observed that Dr. Hubbuch's office notes did "not reveal abnormal psychiatric/cognitive issues on clinical examinations or abnormal mental status exam findings. . . . There is no neuropsychological assessment for the period of review establishing that [Ehlert] had ongoing and clinically significant cognitive deficits." (AR at 257.)

Joseph M. Vinetz, M.D., Director, Travel and Tropical Medicine, Professor of Medicine at U.C. San Diego, reviewed Ehlert's records and spoke with Dr. Hubbuch; Dr. Vinetz submitted a report dated May 20, 2016.  (AR at 144; 251-54; 597.) According to Dr. Vinetz:

> There is no clinical evidence in the documentation provided that any limitations on the basis of any infectious disease can be justified. True Lyme disease is treatable and symptoms would resolve, but would not manifest as documented in the records. The Lyme disease diagnosis as an explanation for [Ehlert's]  complaints of fatigue, small joint pains, muscle pains, cognitive impairment does not have a reasonable basis in the medical literature. A diagnosis of chemical sensitivities is brought up but not documented. A diagnosis of bartonellosis is brought up and treated but not documented or justified.

AR at 253.

On October 12, 2016, Jennifer Hanrahan, D.O., Board Certified in Internal Medicine and Infectious Diseases, completed an independent peer review. (AR at 2339-46.) After summarizing the medical records and evidence revaluated, Dr. Hanrahan opined:

> The medical information does not support functional limitations. Repeated physical exams were normal by [Ehlert's] primary care provider and gynecologist. [Ehlert] was advised to return for annual exams, indicating no evidence of serious health problems. There are no functional limitations that require reduction in ability to work full time.
> \*\*\*\*\*
> Functional capacity testing is outside of my scope of practice. I cannot comment on [Ehlert's] effort or the validity of the testing. The fact that [Ehlert] is able to walk

her dog for 30-45 minutes every day, and swim twice a week indicates that her level of functioning is normal. The notes report that she sleep[s] between 5-8 hours, which is adequate, and that she was able to work from home, but could not work in the office for more than [four] hours due to chemical sensitivity. There is no medical evidence of medical problems related to chemical sensitivity.

*****

No physical functional impairment is identified that requires reduction in ability to work full time.

AR at 2345-46.

MetLife denied Ehlert's LTD claim on November 21, 2016, concluding that

the medical documentation does not support a severity of impairment that would preclude [Ms. Ehlert] from performing the duties of her own job from December 23, 2015 to the present time. MetLife acknowledges that she may be experiencing some psychiatric and physical symptoms such as fatigue, muscle pain, and joint pain which may warrant ongoing treatment; however, there are no clinical findings of a disabling condition that would prevent her from performing her own job.

AR at 2224-28.

In May 2017, Ehlert appealed the decision. (AR at 2001-2162.) In response to the appeal, MetLife reviewed its prior denial and additional records submitted by plaintiff. (AR at 507-19.) Plaintiff's file was sent to independent physician consultants[10] to obtain their opinions "as to

---

[10] The regulations applicable up to January 2017 obligated employee benefit plans to consult with medical experts. Claims procedures were required to "[p]rovide that, in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment . . . the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment[.]" 29 C.F.R. § 2560.503-1(h)(3)(iii). Moreover, the law is clear that plan administrators may rely on a "nonexamining physician's review of a claimant's file" in making benefits determinations. *Gannon v. Metro. Life Ins. Co*., 360 F.3d 211, 214 (1st Cir. 2004); s*ee Richards v. Hewlett-Packard Corp.,* 592 F.3d 232, 241 (1st Cir. 2010).

Plaintiff notes that MetLife's physician consultants have histories of consulting for insurance companies, and that "reviewing physicians are not immune from the same biases MetLife seeks to attribute to Ms. Elhert's treatment team." (#64 at 15.) Apart from this general statement, there is no evidence proffered to show that there was any specific bias in this case.

whether the medical information contained in Ms. Ehlert's file provided clinical evidence of functional limitations and restrictions, as of December 24, 2015." (AR at 508.)

Dr. Vishal Didwania, Board Certified in Infectious Disease and Internal Medicine, conducted a review of Ehlert's medical records, including progress notes and lab results. (AR at 1917-1927.) In an 11-page report dated June 23, 2017, Dr. Didwania opined that the medical information did not support the functional limitations due to a physical condition or combination of physical conditions as of December 24, 2015. *Id.* Specifically, he stated that "[a]s an Infectious Disease physician evaluating on the basis of functional restrictions related to her diagnosis of Lyme disease, this diagnosis does not support her possible limitations." (AR at 1925.) Further, "[t]he current medical literature including guidelines by the Infectious Disease Society of American do not support or recommend Lyme disease as an etiology for chronic symptoms lasting greater than six months." *Id.*[11]

Dr. Marcus Goldman, Board Certified in Psychiatry, also reviewed plaintiff's medical records. In a June 16, 2017 report, Dr. Goldman opined that the medical evidence did not support the functional limitations as of December 24, 2015. (AR 835-38.) In particular, he noted that

> [g]iven [Elhert's] cognitive complaints it would ordinarily be expected that a. . .battery of neuro/psychological testing would have been administered to quantify any such impairment. Nevertheless the majority of data contained in the record regarding [plaintiff's] limited psychiatric complaints are self-reported. . . . There are no progress notes for the dates in question that support evidence of impaired processing, consistent evidence of comprehensive and quantified cognitive disfunction . . . or other signs typically associated with a limiting mental disorder such as . . . gross distractibility or inattention, [or] disorganization[.]

---

[11] Dr. Crandell disagreed with Dr. Didwania's conclusion that Ehlert's diagnosis of Lyme disease does not support her possible limitations by stating that "her Lyme disease has resulted in persistent impairment." (AR at 751.) Dr. Lantsman also disagreed with Dr. Didwania's findings because "IDSA guidelines re: Lyme disease are outdated and don't follow modern literature on Lyme disease." (AR at 526.)

(AR at 837.) Dr. Goldman spoke with Dr. Hubbuch on June 20, 2017, but that conversation, in which Dr. Hubbuch stated that Ehlert "did not look bad" in the neuropsychological testing and "[t]here were no observable cognitive issues in the office," did not change his opinion. (AR at 838.) Neither did the April 11, 2017 assessment by Dr. Bekken alter his view. (AR at 838-39.) In a third addendum dated September 15, 2017, Dr. Goldman reviewed all of the updated medicals and concluded, inter alia: "Regarding [Elhert's] cognitive issues, they historically have been noted to be mild and so [it] is unclear how the [SSA] determination was made to translate the mild findings into moderate limitations to the extent that [Ehlert] was then deemed to be disabled. . . . No major neurocognitive disorder has been adequately established." (AR at 841.)

In July 2017, Kevin L. Trangle, M.D., Board Certified in Occupational and Environmental Medicine, Internal Medicine, and Preventative Medicine completed an Independent Medical Records Review, thirty-four pages in length. (AR at 484, 601, 606-40.) Dr. Trangle engaged in an extensive review of the medical records, and he spoke with Dr. Lantsman and Dr. Crandell. (AR at 606-30.) Dr. Trangle opined that he did "not find evidence in the records of a cognitive disorder of such severity as to have precluded full-time in her own occupation as of 12/24/2015" (AR at 632); that "[r]eview of the records and discussion with Drs. Lantsman and Crandell also failed to reveal specific findings to support a level of physical functional impairment as of 12/24/2015 that would have precluded Ms. Ehlert from working in her own sedentary occupation" *Id*.; that "there is insufficient evidence to support ongoing physical functional impairment as a result of" Lyme disease, MCS (multiple chemical sensitivities), or OSA (obstructive sleep apnea) for the period from 12/24/2015 forward. (AR at 635-36.) Dr. Trangle concluded that "[t]he medical evidence as a whole supports [Ehlert's] ability, from a physical standpoint, to work in her own sedentary occupation as of 12/24/2015 forward." (AR at 637.)

Dr. Trangle submitted an Addendum to his report on September 25, 2017, after receiving additional reports and information. (AR at 877-82.) After reviewing the updated documentation in detail, Dr. Trangle reiterated that "[n]o new evidence has been provided that would cause [m]e to change any of my opinions[,]" and "there continues to be insufficient medical evidence to support the presence of a condition or combination of conditions that would be capable of causing the profound fatigue report by [Ehlert]." (AR at 881.) He opined that "[w]ith specific regard to the SSA records, the included residual functional capacity assessment outlined [Ehlert's] physical abilities which exceeded those required to work in her own occupation on a sustained and full-time basis." *Id*. Dr. Trangle also disagreed with the conclusion of the vocational analysis (AR at 530-39) performed by Michael LaRaia, i.e., that Ehlert "is disabled from her own occupation based on her physical . . . conditions." (AR at 882.)

On September 25, 2017, John Brusch, M.D., Board Certified in Internal Medicine, Geriatric Medicine and Infectious Disease, submitted a 7-page report. (AR at 762-68.) Dr. Brusch reviewed Ehlert's file and spoke with Dr. Hubbuch, who stated that she had not seen plaintiff in at least a year, but "believed that her biggest restriction or limitation was cognitive in nature." (AR at 764.) In Dr. Brusch's opinion:

> On the basis of any infectious disease in particular Lyme infection, the medical information does not support functional limitations from 12/24/15 continu[ing] through the present date.
>
> *****
>
> In this case, [Ehlert] has had essentially normal physicals. Her neurological findings see[m] to be limited to [l]arge and small fiber neuropathy which does not reach a level of severity that interferes with her gait. . . . There is no objective measurement of cognitive difficulties in this patient.

(AR at 767.) After considering further documentation including a response letter from Dr. Hubbach,[12] the Residual Functional Capacity Questionnaire submitted by Dr. Lantsman, the Vocational Assessment Report from Michael LaRaia, and correspondence with exhibits from plaintiff's attorney, on November 7, 2017, Dr. Brusch stated that his "original determination is unchanged." (AR at 650-52.)

Based on the record, by letter dated November 9, 2017, MetLife confirmed the denial of plaintiff's LTD claim.

IV. <u>Standard of Review</u>.

The First Circuit has stated that "motions for summary judgment . . . are nothing more than vehicles for teeing up ERISA cases for decision on the administrative record. The burdens and presumptions normally attendant to summary judgment practice do not apply." *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 813 F.3d 420, 425 n.2 (1st Cir. 2016) (internal citation omitted); *Doe v. Harvard Pilgrim Health Care, Inc*., 974 F.3d 69, 72 (1st Cir. 2020); *Doe v. Standard Ins. Co*., 852 F.3d 118, 123 n.3 (1st Cir. 2017). "[A] challenge to a denial of benefits is to be reviewed de novo 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Stephanie C.,* 813 F.3d at 427 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

There is no dispute in this case that MetLife was afforded discretionary authority under the terms of the LTD Plan. In such circumstances,

> [w]here, as here, the plan administrator is explicitly given discretionary authority
> by the terms of the Policy, we ask whether its decision is arbitrary and capricious

---

[12] In his report, Dr. Brusch concluded that "[t]here is no evidence that this woman suffers from Lyme disease." (TR at 767.) Dr. Hubbuch disagreed, stating in an October 15, 2017 letter that "[t]here is a known entity of continued symptoms after Lyme disease in 20-30% of treated patients. Post Treatment Lyme Disease Syndrome (PTLDS) has been researched. The disability can be severe. [Ehlert's] symptoms fit this pattern." (AR at 742.)

or an abuse of discretion. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 109 S. Ct. 948, 103 L. Ed.2d 80 (1989); *Doe v. Standard Ins. Co*., 852 F.3d 118, 123 (1st Cir. 2017). That is, we must defer where the "decision is reasonable and supported by substantial evidence on the record as a whole." *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 379 (1st Cir. 2015). "Substantial evidence" is "evidence reasonably sufficient to support a conclusion." *Doyle v. Paul Revere Life Ins. Co*., 144 F.3d 181, 184 (1st Cir. 1998). . . . Moreover, "[s]ufficiency. . . does not disappear merely by reason of contradictory evidence." *Id*. The job of a court is not to decide the "best reading" of the policy, *O'Shea v. UPS Ret. Plan*, 837 F.3d 67, 73 (1st Cir. 2016), but rather, to evaluate whether [the plan administrator's] conclusion was "reasonable." *Colby v. Union Sec. Ins. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan*, 705 F.3d 58, 62 (1st Cir. 2013).

*Arruda v. Zurich Am. Ins. Co*., 951 F.3d 12, 21 (1st Cir. 2020); *Lavery v. Restoration Hardware Long Term Disability Benefits Plan*, 937 F.3d 71, 78 (1st Cir. 2019); *Vendura v. Boxer*, 845 F.3d 477, 482 (1st Cir. 2017) (internal citations and quotation marks omitted) ("the deferential arbitrary and capricious standard . . . is functionally equivalent to the abuse of discretion standard. And, under that standard, we must defer to plan administrators when they reasonably construe ambiguous plan terms").[13] If supported by substantial evidence, the administrator's decision must be upheld even if the evidence could also arguably admit to a different interpretation and result.

---

[13] The parties agree that the arbitrary and capricious standard is to be applied. (#55 at 16-17; #57 at 18-20.) Plaintiff did not argue that MetLife acted under a conflict of interest in her motion for judgment but did raise the issue in her opposition to defendant's motion and reply (#64 at 1-2; #66 at 1) albeit without "showing that the conflict influenced [MetLife's] decision." *Cusson v. Liberty Life Assur. Co. of Bos*., 592 F.3d 215, 225 (1st Cir. 2010) (citation omitted), *abrogated on other grounds by Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136 (2016). MetLife, on the other hand, has submitted evidence to show the steps it takes "[t]o insure the integrity of its claims processing." (#65-1); *Lavery v. Restoration Hardware Long Term Disability Plan*, 937 F.3d 71, 79 (1st Cir. 2019) ("Aetna produced evidence showing steps it has taken to minimize the effects of this conflict. Such precautions would normally cause us to afford little to no weight to Aetna's structural conflict."). In any event, "[w]here, as here, the administrator is the entity that both resolves benefit claims and pays meritorious claims, there is a structural conflict of interest. While the existence of such a structural conflict does not alter the standard of review, it is a factor that a court may draw upon to temper the deference afforded to the claims administrator's decision." *Jette v. United of Omaha Life Ins. Co*., No. CV 18-11650-JCB, 2020 WL 4559986, at *8 (D. Mass. Jun. 19, 2020) (internal citations and quotation marks omitted).

*See Leahy v. Raytheon Co.*, 315 F.3d 11, 18-19 (1st Cir. 2002) ("Disability, like beauty, is sometimes in the eye of the beholder. This is such a case: we have scrutinized the record with care and conclude, without serious question, that it is capable of supporting competing inferences as to the extent of the plaintiff's ability to work. That clash does not suffice to satisfy the plaintiff's burden. We have held before, and today reaffirm, that the mere existence of contradictory evidence does not render a plan fiduciary's determination arbitrary and capricious.").

V. <u>Discussion</u>.

Ehlert challenges the denial of her LTD claim on two bases. First, plaintiff asserts that she met her burden of proof under the terms of the LTD Plan because she established she was unable to perform the duties of her own occupation consequent to the symptoms of Lyme disease and its associated limitations. (#55 at 17-18.) Second, Ehlert contends that she was not afforded the full and fair review of her claim required by ERISA. *Id.* at 19-30. Each of these arguments will be addressed in turn.

A. <u>Burden of Proof</u>.

Ehlert argues that she met her burden of proving that she was unable to perform the duties of her own occupation as a result of the symptoms of Lyme disease and its associated limitations. She contends that her complaints about her symptoms have been consistent, and that those symptoms progressed to a point where she was advised to stop working.

Plaintiff has reported fatigue and unclear thinking dating back to at least 2012, when she related the symptoms to chemical sensitivity. In the summer of 2014 when plaintiff was tested for Lyme disease, the results were negative but with the possibility of low antibodies, so she began a two-week course of antibiotics. In October, Ehlert reported to Dr. Hubbuch that her fatigue and short-term memory issues improved after taking the antibiotics.

After plaintiff contracted Lyme disease in or around June of 2014, she continued to work for another year and a half until December 2015. Ehlert had appointments with Dr. Hubbuch throughout this time, during which she reported memory problems, difficulty with organization, joint stiffness, and fatigue. In November 2015 plaintiff told Dr. Hubbuch that she was being laid off. In mid-December 2015 Dr. Hubbuch determined that Ehlert was unable to work full-time due to fatigue and cognitive issues, as all of plaintiff's symptoms had worsened in the preceding 3-4 months. Ehlert's purported decline was apparently based on her own self-report; the testing Dr. Hubbuch had planned for her did take place until 2016. In December 2015, Dr. Hubbuch expected plaintiff to be able to return to work at least three full days per week within three months. When the neuropsychological testing was completed some months later, Dr. Hubbuch stated that the testing did not show much and there were no observable cognitive issues.

After she had stopped working, plaintiff began seeing Dr. Crandell for "associated neurocognitive issues." Dr. Crandell's notes reflect that Ehlert consistently complained about fatigue, problems with her memory, brain fog, pain/numbness in her hands, and anxiety. While under Dr. Crandell's care, testing for speech and language therapy found "mild cognitive-communication" and "mild word finding deficits." Her neuropsychology examination was fairly unremarkable, although it did show a high score in working memory. A follow-up neuropsychology evaluation in April 2017, sixteen months after she stopped working, was consistent for some small fiber neuropathy. Her study disclosed sleep apnea, but she did not get a CPAP system. In September 2017, while listing her symptoms as numbness, fatigue, lack of endurance, headaches, and difficulty remembering, Dr. Crandell found that Ehlert was not totally disabled from any occupation.

Plaintiff became a patient of Dr. Lantsman in September 2016, nine months after she stopped working. Again, her reported symptoms were fatigue, memory and cognition issues, and headaches. When completing a Residual Functional Capacity Questionnaire on Ehlert's behalf, Dr. Lantsman listed a litany of symptoms/conditions from which plaintiff reported she suffered, but MetLife's consultant physicians found little to no objective medical evidence to support those symptoms/conditions as being disabling.

Plaintiff questions MetLife's experts' "lack of experience with her illness, [and] their disbelief that Lyme disease can be disabling[.]" (#55 at 18.) Clearly Dr. Didwania and Dr. Brusch are qualified to offer opinions with respect to infectious diseases given that both are Board certified in the field. That they disagree with plaintiff's treating physicians does not equate to a "lack of experience."

It is not necessary to wade into the debate raging about guidelines for treating Lyme disease. Suffice it to say, there are at least two sides to the issue, as can be seen by comparing Dr. Didwania's opinion and Dr. Brusch's opinion with those of Dr. Lantsman and Dr. Crandell. The medical science surrounding Lyme disease is not the focus here. The issue is whether Ehlert submitted proof that she suffered such physical or cognitive limitations that she was disabled within the meaning of the LTD plan. On that question, as the review of the medical evidence has shown, the doctors are at odds.

There is no dispute that Ehlert has a lengthy history of reported, consistent symptoms. MetLife and its consultant physicians did not merely gloss over the treating physicians' notes and opinions. Rather, her treating physicians' longitudinal reports concerning these physical and cognitive limitations were recognized and acknowledged. However, the objective evidence that Ehlert's "illnesses rendered her unable to work," *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d

20

9, 16 n.5 (1st Cir. 2003), was open to legitimate question. Evidence regarding the nature and extent of Ehlert's cognitive limitations was disputed. MetLife's consultant physicians found that testing revealed plaintiff's cognitive limitations to be mild. Her treating physicians do not specifically say otherwise, even while opining that she is disabled, or partially disabled, based on her symptoms.

The objective evidence supporting her physical limitations was also not definitive. For example, Ehlert's claims of fatigue ebbed and waned throughout the record while she simultaneously reported biking, swimming, walking her dog, hiking, and going to the gym. Dr. Hubbuch repeatedly stated that she could sit for 6-8 per day, which would be consistent with a sedentary job, while opining that Ehlert's primary issues were cognitive.  While Dr. Bekken observed that plaintiff fatigued easily, Dr. Panis opined that she could work from home four hours a day.

The First Circuit has reiterated "that the mere existence of contrary medical evidence does not render arbitrary and capricious a plan administrator's decision to credit one opinion over another. Indeed, when the medical evidence is sharply conflicted, the deference due to the plan administrator's determination may be especially great." *Ortega-Candelaria v. Johnson & Johnson*, 755 F.3d 13, 28 (1st Cir. 2014) (internal citations and quotation marks omitted).

B. Full and Fair Review.

ERISA incorporates a provision mandating a full and fair review of a participant's claim. Specifically, the statute provides that:

[E]very employee benefit plan shall –

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. ERISA requires that the review of a claim for benefits 'afford a reasonable opportunity . . . for a full and fair review of dispositions adverse to the claimant. Nothing in the Act itself, however, suggests that plan administrators must accord special deference to the opinions of treating physicians. . . .Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830-831 (2003) (alteration in original) (internal citation omitted); *see also Stephanie C.*, 813 F.3d at 426 (internal citation omitted) ("Although [plaintiff] contends that [defendant]'s denial failed to take into account the supporting materials that she had submitted [], that is sheer speculation. The mere act of upholding a denial of benefits cannot mechanically be equated with overlooking medical evidence that tends to support a different outcome. Nor was [defendant] obliged to accept unquestioningly the pronouncements of [the plaintiff]'s [doctors].").

1. Selective Review of Treating Physicians.

Ehlert contends that MetLife failed to provide her claim a full and fair review by selectively assessing her claim and glossing over the opinions of her treating physicians. To support her contention that Met Life's consultant physicians "'deemphasized' Drs. Lantsman, Hubbach, and Crandell's clinical evaluations and findings," (#55 at 21), plaintiff relies on the First Circuit decision in *Gross v. Sun Life Assurance Co. of Canada*, 880 F.3d 1, 12 (1st Cir. 2018).

The *Gross* case can be distinguished at the outset because a de novo standard was applied. *Gross*, 880 F.3d at 10. Moreover, the case was a second appeal after a remand; on the first appeal, the court "found [plaintiff's] medical evidence sufficient to prove her entitlement to benefits" and that plaintiff "had met her burden to show her total disability[.]" *Id.* at 10-11. Having determined

that plaintiff had established her entitlement to benefits, the Court of Appeals remanded on the

question of "the effect that [certain] surveillance evidence, when viewed in context, may have on

other evidence indicating disability." *Id.* at 7 (internal citation and quotation marks omitted). It

was in this context that the First Circuit wrote:

> Where the determination of disability depends on an assessment of largely
> subjective, self-reported symptoms, those who have had in-person exposure -
> whether treating physician or not - have access to information unavailable to non-
> examining doctors.
>
> To be clear, we are not saying as a general matter that the views of examining
> doctors are entitled to more more weight than the opinion of a doctor who performs only
> a records review. Indeed, we have held to the contrary. However, where the
> claimant's credibility is a central factor in the disability determination - and
> particularly where, as here, the claimant's in-person presentation of symptoms was
> credited by the independent medical examiner, . . . the impressions of examining
> doctors sensibly may be given more weight than those who looked only at paper
> records.

*Id.* at 14 (internal citations and quotation marks omitted).

In any event, plaintiff's contention is unfounded. The law is clear that "a plan administrator

may not 'cherry-pick the evidence it prefers while ignoring significant evidence to the contrary.'"

*Al-Abbas v. Metro. Life Ins. Co.*, 52 F. Supp.3d 288, 295 (D. Mass. 2014) (quoting *Winkler v.*

*Metro. Life Ins. Co.*, 170 Fed. Appx. 167, 168 (2d Cir. 2006)); *Petrone v. Long Term Disability*

*Income Plan for Choices Eligible Emps. of Johnson & Johnson & Affiliated Cos.*, 935 F. Supp.2d

278, 293 (D. Mass. 2013)). This is not a case, however, where contrary evidence was blithely

ignored or "where the only medical evidence ran in [plaintiff's] favor[.]" *Richards v. Hewlett-*

*Packard Corp.*, 592 F.3d 232, 241 (1st Cir. 2010) (internal citation and quotation marks omitted).

MetLife's consultant physicians reached out to plaintiff's treating physicians and, where possible,

had teleconferences to discuss Ehlert's case. Lengthy and comprehensive consultant physician

reports were submitted. Ehlert's LTD benefits decision was thirteen pages in length and detailed

the reasons for the denial. That the physician consultants disagreed with plaintiff's treating physicians does not mean that that they "deemphasized" their clinical evaluations and findings.

    2.   Rejection of Functional Limitations Evidence.

MetLife is said to have rejected evidence supporting Ehlert's functional limitations, specifically the functional capacity evaluation (FCE).[14] The FCE was performed on July 18, 2016, by Kerry A. Raymond, MS, OTR/L, CHT. (AR at 2011-13.) Based on the four-hour test, Ms. Raymond opined that "Ehlert does not demonstrate the physical abilities consistent with those required to work at a sedentary to light physical capacity [job] on a full or part-time basis under a regular work schedule, due to fatigue, lack of endurance and short term memory issues that she experiences due to Lyme Disease." (AR at 2011.)

MetLife's consultant, Dr. Trangle, took issue with that opinion, noting at the outset that the physical therapist was "not a physician and [was] not qualified to offer such an opinion." (AR at 633.) Dr. Trangle concluded that Ms. Raymond

> based [her] opinion on a set of assumptions made based on Ms. Ehlert's subjective reporting[,] without any corroboration with the medical records or discussions with treating providers. [Her] conclusion is obviously based on subjective factors as [she] noted fatigue and lack of endurance as the primary physical issues affecting her functional capacity. As noted above, the results were at least consistent with her ability to work at a sedentary physical capacity with the exceptions of shoulder and floor lifting which could easily be accommodated given the required duties of her own occupation.

---

[14] An FCE evaluates an individual's "functional capacities." *Gannon v. Metro. Life Ins. Co.,* 360 F.3d 211, 213 (1st Cir. 2004). "While the amount of fatigue or pain an individual experiences may be entirely subjective, however, the extent to which those conditions limit a person's functional capabilities can be objectively measured. . . . Generally, the functional capacity evaluation ("FCE") is an objective measure of a person's physical limitations." *Moros v. Conn. Gen. Life Ins. Co*., No. CIV.A. 12-5468, 2014 WL 323249, at *10 (E.D. Pa. Jan. 29, 2014).

*Id*. Dr. Trangle also noted that "[a]ge and gender-match normative values were not elucidated but the actual measured values generally fell within the published values considering her age and gender." (AR at 620.)

In response to Dr. Trangle's comments, Ms. Raymond acknowledged that the FCE relied on observation of the test taker over an extended period of time to assess physical tolerance. (AR at 753.) Ms. Raymond stated that Ehlert:

> demonstrated difficulty completing fine motor coordination tasks and needed verbal cueing for proper peg placement with post testing. Her scores also decreased slightly with pre and post testing. Furthermore, the tasks that I gave her to complete were not nearly as cognitively challenging or time sensitive as those that she would need to attend to while working as a Vice President / Actuary at Towers Watson, which is truly the issue at hand. The behaviors and the tolerances observed over a 4[-]hour period were not consistent with the ability to work at the pace required at such a high executive level. Given the consistent results of her testing, I do not have reason to believe that she was not giving full effort or not reliable in her reports of fatigue, pain, or cognitive fog.

> Ms. Ehlert may be able to perform work[-]related activities at a sedentary level such as typing, sitting, and standing, but not on a sustained, consistent, day-to-day basis. Because of this, she is not able to work as a high-functioning executive.

*Id*.

It is true, as Ehlert contends, that the First Circuit has found an FCE does "provide[] objective clinical evidence" of a test taker's physical capabilities. *Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir. 2004); *Cf. Ortega-Candelaria,* 755 F.3d at 27 ("we have previously held that an administrator's decision to terminate disability benefits was not arbitrary and capricious even where that decision was supported in part by an FCE conducted by a physical therapist and was directly contradicted by the claimant's two treating physicians."). But that does not mean that the FCE must be blindly adopted.

In this case, for example, Ehlert completed neuropsychological testing in April 2016 at about the same time as the FCE. (AR at 1046.) That testing "showed [Ehlert] in the superior range

on the WAIS-IV,[15] as well as high scores on perceptual reasoning and working memory") *id.*, which differs from Ms. Raymond's assessment.[16] Plaintiff's treating physician, Dr. Hubbuch, stated Ehlert "complained of memory problems, fatigue, confusion, 'but really subtle things,'" that the neuropsychological testing "'didn't show much,'" and that Ehlert "'did not look bad on testing.'" (AR at 838.) Moreover, in June 2016, while Ehlert's chief complaint was fatigue, she reported biking seven miles, three or four times a week. (AR at 1198.) At her final visit with Dr. Hubbuch on July 18, 2016, plaintiff continued to complain of fatigue and problems with short term memory, but also reported swimming and biking several times per week. (AR at 1200.)

A speech and language evaluation was completed in March 2016, by Rachael Licker, MS, CCC-SLP. (AR at 1055-60.) Ehlert scored above-average on the Boston Naming Test. (AR at 1055.) She was found to be alert and oriented, able to comprehend information presented at the conversational level, and able to communicate with fluent speech at the conversational level with no evidence of word finding difficulties. (AR at 1058.) Plaintiff reported no difficulties in reading comprehension or written expression. *Id.* She was able to attend to task and conversation within a quiet environment, as well as recall personal and past medical history. *Id.* Ehlert responded to questions and completed written information within an appropriate amount of time. (AR at 1059.) She was able to initiate conversation and generate solutions to functional problem-solving scenarios. *Id.* Ms. Licker's assessment was that Ehlert "present[ed] with mild cognitive-

---

[15] The WAIS-IV is the Wechsler Adult Intelligence Scale/Fourth Edition, a test for "evaluating cognitive functioning[.]" WAIS-IV, WMS-IV, and ACS, Advanced Clinical Interpretation, https://doi.org/10.1016/B978-0-12-386934-0.00001-8 (last visited 11/06/2020).

[16] Plaintiff was also observed to have "mild sequencing difficulties," (AR at 1046) which is common for individuals with ADHD, and "a DSM 5 diagnosis of somatic symptom disorder." (AR at 2008.)

communication deficits characterized by decreased attention, memory and executive function skills as well as a question of mild word finding deficits." *Id.*

On August 3, 2016, Walter Panis, M.D., at Massachusetts General Hospital conducted an Independent Medical Examination of Ehlert. (AR at 1112-16.) Following a review of plaintiff's history, her medical record, and a physical examination, Dr. Panis' impression was as follows:

> Based upon the history obtained, examination done, and records reviewed[,] she does appear to have had Lyme disease. In addition, she has a history of chronic multiple chemical sensitivities. The records from Dr. Hubbuch, Dr. Crandell and speech pathology are quite consistent. Although it is not possible for me or anyone to measure someone's fatigue, it is a common complaint in clinical conditions such as this. I would be reluctant to totally disable this woman. She certainly has some abilities. I have not been supplied with her job description but it appears to need complex cognitive abilities as well as it appears to demand a high level of attention, effort[,] and energy. I would agree with Dr. Hubbuch that accommodations for work are appropriate. Working from home [four] hours a day should be reasonable.

(AR at 1115.)

In April 2017, Kaaren Bekken, Ph.D., performed a brief organic assessment of Ehlert in connection with her application for social security disability. (AR at 1827-29.) Dr. Bekken opined that:

> Ehlert presents with estimated <u>above Average</u> intellectual capacity, presently today with scores that are mainly in the Average range, but range from Average to Superior levels in the quiet 1:1 setting; note that she reported feeling good today, but that this is not consistently the case. She did fatigue easily during and after two hours of interview and tests. A full evaluation would be needed to accurately assess whether the degree to which today's results represent significant deficits relative to potential, but this is most likely the case. Results are judged to be credible.
>
> Her physical limitations include significant fatigue, chemical sensitivities, vestibular symptoms, dizziness, etc., which caused her to stop working (in combination with the cognitive deficits).

(AR at 1829 (emphasis in original).)  MetLife's consultant, Dr. Goldman, stated that Dr. Bekken's assessment did not change his opinion because the "results suggested above average intellectual capacity with scores in the mainly average range, ranging from average-superior. Axis

1 diagnoses do not include any major neurocognitive condition. Further, the report does not address functionality, which is the issue in question." (AR at 1719.)

In sum, the FCE is not the only evidence bearing on Ehlert's functional limitations, and it does not stand undisputed. "[I]t is not 'for a court to determine precisely how much weight [an insurer] should have accorded [a particular piece of evidence] in its overall decision.'" *Tsoulas v. Liberty Life Assur. Co. of Bos.*, 454 F.3d 69, 77 (1st Cir. 2006) (quoting *Gannon*, 360 F.3d at 214).

3. <u>Occupational Demands</u>.

In July 2017, vocational consultant Michael LaRaia, M.A., LRC, CMM, performed a vocational analysis of Ehlert. (AR at 530-39.) Mr. LaRaia reviewed plaintiff's medical records and reports, summarized the medical history and "expressed symptoms/limitations," and Ehlert's education and vocational history. (AR at 530-35.) It was Mr. LaRaia's opinion that

> [t]he combination of Ms. Ehlert's physical and cognitive impairments, and resultant limitations, combine and compound to adversely affect her ability to meet the physical and/or cognitive requirements of her past employment. Even if Ms. Ehlert was able to return to her past employment, her ability to "sustain" employment would be clearly compromised. . . .Unfortunately, Ms. Ehlert's inability to engage in even Sedentary, part time work is now clearly precluded.

AR at 539.

In a Vocational Assessment Addendum Report dated August 28, 2017, Mr. LaRaia noted that he had been asked to review updated documents, specifically the reports of MetLife's consultant physicians. (AR at 1374.) He then prefaced his review by stating that his "initial reaction focuses on the fact that none of the above referenced medical professionals conducted their own examinations of Ms. Ehlert. The reports, although addressing the medical record, do not provide sufficient weight to the opinions of the actual treating professionals who are most familiar with the longitudinal course of care and symptomology that Ms. Ehlert has experienced." *Id*. The view expressed by Mr. LaRaia is contrary to the law in this Circuit. *See Richards,* 592 F.3d at 241

("[W]e have squarely held that an insurer is not required to physically examine a claimant, and that benefit determinations may be based on reviews of medical records."); *Orndorf v. Paul Revere Life Ins. Co.,* 404 F.3d 510, 526 (1st Cir. 2005) (citing *Nord,* 538 U.S. at 831) ("The opinion of the claimant's treating physician, which was considered, is not entitled to special deference. . . . Denials of benefits may be based on review of medical records submitted by the claimant."); *Gannon*, 360 F.3d at 214 ("That Dr. Greenhood did not physically examine Gannon does not decrease the credibility of his medical opinion. . . . On the contrary, we have treated a nonexamining physician's review of a claimant's file as reliable medical evidence on several occasions.").

Mr. LaRaia went on to opine that "Ehlert is precluded from returning to her former position . . . despite any medical professional's opinion to the contrary. . . . [T]he combination of Ms. Ehlert's physical and mental impairments[,] and resultant limitations, combine and compound to adversely affect her ability to meet the physical and/or mental requirements of her own occupation." (AR at 1376.) Plaintiff's argument that, in contrast to MetLife's vocational consultant,[17] Mr. LaRaia "reviewed all of the evidence in Ms. Ehlert's file, including MetLife's

---

[17] On September 1, 2017, MetLife's vocational rehabilitation consultant Susan M. Sineni, MS, CRC, LCPC, opined that considering the Physician File Reviews of Dr. Goldman and Dr. Didwania that Ehlert's restrictions and limitations were not supported, and Dr. Trangle's list of plaintiff's expected physical functional abilities:

> Based on my own analysis, Ms. Ehlert has the residual functional capacity to return to her own occupation of Senior Consultant/Actuary. She has the ability to work within the restrictions and limitations as stated [in the Physician File Reviews]. An Own Occupation Analysis and Labor Market Survey were performed which indicate potential jobs exist in the local economy at commensurate wages.

AR at 1380-82.

evidence, in rendering his determination" (#55 at 26), rings hollow given Mr. LaRaia's admission that he essentially only afforded weight to Ehlert's treating physicians.[18]

    4. <u>SSDI Benefits</u>.

    Ehlert contends that her award of Social Security disability benefits is "significant evidence" of her inability to perform the duties of her occupation. (#55 at 28.) While certainly the SSDI decision is evidence to be considered, the First Circuit has "held that 'benefits eligibility determinations by the Social Security Administration are not binding on disability insurers.' While the Social Security determination might be relevant to an insurer's decision, 'it should not be given controlling weight except perhaps in the rare case in which the statutory criteria are identical to the criteria set forth in the insurance plan.'"[19] *Richards*, 592 F.3d at 240 (quoting *Pari-Fasano v. ITT Hartford Life & Accident Ins. Co*., 230 F.3d 415, 420 (1st Cir. 2000)); *Jette v. United of Omaha Life Ins. Co.*, No. CV 18-11650-JCB, 2020 WL 4559986, at *11 (D. Mass. June 19, 2020).

    The issue here is whether plaintiff was entitled to LTD benefits in the first instance, to wit, whether Ehlert was "[d]isabled . . . due to sickness, or as a direct result of accidental injury, [was] receiving appropriate care and treatment, and [was] complying with the requirements of such treatment[,] and [was] [u]nable to earn more than 80% of [her] predisability earnings at [her] own occupation for any employer in [her] local economy after a 26[-]week elimination period and during the [twenty-four] months of sickness or accidental injury[.]" (AR at 12, 62.)  In arguing that the SSA standard of disability is more rigorous, Ehlert is focusing on the "any occupation" standard which applies after a claimant has been disabled from her "own occupation" for twenty-four months. *Id*. As explained by the First Circuit in the context of a different insurance company's

---

[18] Mr. LaRaia's opinion is also substantively challenged by Dr. Trangle. (AR at 882.)

[19] Plaintiff makes no argument that the criteria are identical in this case.

policy, the insurer's "'any occupation' analysis is less rigorous than the SSA's 'any occupation' analysis. When the SSA evaluates whether an applicant is capable of performing 'substantial gainful activity,' it does not limit the sphere of jobs which the applicant is capable of doing based on the applicant's predisability earnings." *U.S. ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 303-04 (1st Cir. 2010).

The *Loughren* rationale regarding the tension between the insurer's "any occupation" standard and that of the SSA does not aid plaintiff's cause since the focus in this case is on the "own occupation" standard. Even if the *Loughren* decision was applicable to the inquiry here, it simply does not stand for the proposition that the SSA decision should be given "controlling weight" in this case. (#55 at 29.)

Further, Dr. Goldberg expressed doubt about the rationale supporting the SSA decision. He observed that in the medical records, Ehlert's cognitive issues "historically have been noted to be mild and so [it was] unclear how the [SSA] determination was made to translate the mild findings into moderate limitations to the extent that [Ehlert] was then deemed to be disabled. . . . No major neurocognitive disorder has been adequately established." (AR at 841.) MetLife was entitled to consider this opinion when evaluating SSA's approval of benefits, which it did.[20] In

---

[20] In the decision denying Ehlert's appeal, MetLife wrote:

> We also acknowledge and have considered that Ms. Ehlert was awarded Social Security Disability Income (SSDI) benefits on June 26, 2017 with a benefit start date of June 2016. . . . The Social Security Administration's determination is separate from and governed by different standards than MetLife's review and determination pursuant to the terms of Ms. Ehlert's employer's LTD Plan. . . . Since the awarding of Ms. Ehlert's SSDI benefits, we received additional information on her file, performed teleconferences with her treating providers, and had four IPCs review the file. Based on the review of Ms. Ehlert's file, we have determined the restrictions that were identified would not have prevented her from performing her own occupation. . . . The Psychiatry IPC indicated the designations in the Social

light of the differing applicable standards and the expert's questions concerning the SSA determination, it was up to MetLife to determine the weight to be afforded the decision awarding SSDI benefits.

## VI. Conclusion.

MetLife made a carefully-considered decision to deny Ehlert's application and appeal for LTD benefits. That decision was reasonable and supported by substantial evidence in the record. Under the arbitrary and capricious standard, the decision to deny LTD benefits must be upheld.

For the reasons stated, the Motion for Judgment on the Judicial Record (#54) is DENIED and Defendant's Motion for Judgment on the Administrative Record (#56) is GRANTED. Judgment shall enter for defendant.

/s / M. Page Kelley
M. Page Kelley
November 23, 2020                            Chief United States Magistrate Judge

---

Security report seemed to be speculative and no major neurocognitive disorder had been adequately established in the records.

AR at 518.